Good morning, Your Honors. Derek Wendisco for Appellants, Sunfarms, LLC and Mr. Mitch Domowski. We request the Court to reverse the District Court's summary judgment order for the reasons set forth in our brief. I will address two points in support of our position today. I would like to request three minutes for rebuttal. Yes, Counselor. Please be reminded that the time shown on the clock is your total time remaining. Thank you, Your Honor. We believe the District Court's summary judgment order should be reversed for the following reasons. First, Sunfarms has never been provided a royalty agreement with the project company that was promised to it by Eurus in the consultant services agreement. And second, the Palaua Wind project had been shortlisted for a power purchase agreement by the time Eurus terminated the consultant services agreement in February 2017. The consulting services agreement promised Sunfarms a royalty agreement at the end of the commercial operation date for a completed project with a project company, not with Eurus. And I quote from the… But, Counsel… Go ahead. No, you, please. Well, you've been receiving the royalties, right? So I'm just wondering what damages have you experienced, if any, by Eurus' substitution of itself into the agreement. And thank you, Judge Wall. The measure of damage here is the absence of an asset, the royalty agreement with the project company. That is the asset. What would the damages be for that? The damages are the present value of the royalty agreement, which was calculated at $2,070,000. And so that is a fairly easy present value calculation that was done by the experts to bring those profits, the maximum profits, forward to the present day. But that would assume that the agreement would last until the present day. And wasn't there a right to terminate the agreement? The amount in the agreement was for $2,070,000. And so Sunfarms experts calculated the present value of that amount to the present day and calculated it to be approximately $920,000. But that's assuming you get the maximum royalties every year, right? The way that the contract was drafted, I believe it said that $2,070,000 was the minimum amount that could be calculated in the agreement, and it was to be paid for at least 20 or 25 years. And so that amount, I believe, is firm, and the experts and Sunfarms experts believe that they could reasonably calculate those damages. And so the damages are the difference between the promised royalty agreement. Sunfarms does not have that royalty agreement. That agreement is an asset that was promised to Sunfarms, and it has never received that asset. And so any damages that have been paid in the past years by EURES would just simply mitigate the damages that EURES is going to be responsible to pay. And so from that— So just so I understand, the stream of payments is the $2 million figure. The present value of those $2 million to today's date is the $900,000 figure. Correct. And so the reason that the measure of damages is the value of the promised royalty agreement is because it is beyond dispute that a party cannot substitute itself for another party in an agreement, and that applies even for an LLC. An LLC is a separate and distinct legal entity. Counsel, your argument would have more force if you had not accepted the payments from EURES. Honestly, we would disagree, Your Honor. Why? Because, again, the focus here is not—this is not a dispute over a payment stream. This is a dispute over a contract. Sunfarms filed a lawsuit immediately when it did not receive a contract, a signed, written, executed contract with the project company, which is a separate and distinct legal entity. EURES cannot substitute itself for the project company here. But it did substitute itself. It made the royalty payments that your client was expecting from the other entity, and your client accepted those. I apologize, Your Honor, but that is disputed. Sunfarms has never accepted that two-page, what we call a royalty— No, accepted the payments, though. Right, Your Honor, but that's simply only to mitigate the damages. We have litigated this case for over six years on the fact that there has never been a project— in the very highly liquid market for the resale of these royalty agreements. That asset is what Sunfarms is demanding, and the value of that asset was calculated to be the $920,000. And so what the district court did was basically amended the consulting services agreement and allowed EURES to substitute itself for the project company. And that is not what the consulting services agreement promised. And so we are simply requesting the court to reverse the district court summary judgment order to hold EURES accountable for the promises that it made in the consulting services agreement, the precise promises that was made. And that is a royalty agreement with the project company, not with EURES. They are completely different assets. They are completely different contracts. And it was improper for EURES to substitute itself for that. Did you make the argument about this being a saleable asset at the district court level? We do not believe that. That is, I think, our reasoning for why we are explaining this. But I don't think that changes. We did not raise that with the district court. That does not change the fact that what was precisely promised was an asset, a royalty agreement with the project company. And that is exactly what we requested. We filed a motion for summary judgment on three precise issues. One, that this contract was not precisely with the project company. It was with EURES. And so we did not believe that it was necessary to provide an explanation for why. We were just simply requesting the royalty agreement to be provided with the precise party that was promised in the consultant services agreement. One other part with this is during the negotiations of the royalty agreement was Sun Farms received a draft royalty agreement, and in that EURES demanded Sun Farms to waive the implied covenant of good faith and fair dealing. And we believe that that act in and of itself establishes a breach of the implied covenant of good faith and fair dealing, a separate cause of action. That is an action that does not just simply mirror the cause of action for a breach of contract. The breach of contract damages here would be the $920,000 for the promised royalty agreement. But the alleged breaches of the implied covenant of good faith and fair dealing provide additional damages for lost profits for Palohuawind and solar that are not provided and are in addition to the damages provided for the breach of contract. Now, the second point that I'd like to raise today is the Palohuawind project had been shortlisted for a power purchase agreement by the time EURES had terminated the consulting services agreement in February 2017. For the consulting services How are you defining shortlisted? What actions are you saying amounted to a shortlist? As used in the CSA, it's a phrase, has been shortlisted. And we are defining that to mean selected for final consideration. And that is an undefined shortlisted But the district court did not define it that way, correct? No, the district court actually did. The district court applied, I think, two ordinary and common definitions. And that is what the district court held. That was one of the many definitions that it applies. Selection for final Is the shortlisted a term of art in the industry? It is. But that term was left undefined by EURES, the drafter of this contract. EURES had every right and opportunity to add, to limit, has been shortlisted in this contract to use the formal term of art, which applied only to competitive bidding. EURES drafted this contract and it did not define that term. And so this term has been shortlisted for a power purchase agreement. We believe requires a broad definition to be applied to that. And here it would apply to simply selection for final consideration for a power purchase agreement. But doesn't a shortlist sort of just by its own definition imply a list of candidates and not just one? I suppose I don't really understand the definition of shortlist that you're asking us to. Yeah, and so that has been a dispute. And so it is our position that there can be a shortlist of one. There can even be a shortlist of zero. And I think that is, you know, it does not have to be a tangible shortlist either. Someone can have an idea of a shortlist of items on there or candidates. What is our standard of review on this issue? For this, it should be de novo, Your Honor. And so, you know, the first step in, like, contract determination is, you know, it is a question of law unless there is conflicting extrinsic evidence or if the court considers extrinsic evidence. And I believe here the extrinsic evidence before the district court that the district court did not consider and the dispositive extrinsic evidence here was that Hawaiian Electric was the determinative agency for the issue of shortlisting. That is because both of these projects in the consulting services agreement were developed to be for the power was going to be sold to Hawaiian Electric. And so the conclusion, if a project had been shortlisted, was in effect up to Hawaiian Electric. At what point do you think it was shortlisted? Was it when they entered into the bilateral negotiations or was it after the request for expression of interest? Working backwards, we are saying that no later than January 31st when it was a formal response that was submitted to the expression of interest. And then on February 5th, Hawaiian Electric basically communicated to Eurus and Sun Farms that it has selected the project. But on January 31st, when this was the one and only response to the expression of interest, and it met all of the qualifications and it could be accepted at no later date than January 31st. But on the earlier date, we are applying a broad definition for shortlist, and that would include just simply bilateral negotiations. When a project is being selected for final consideration. And so that would include at the very earliest, the September 22nd meeting between Hawaiian Electric and Eurus, where they discussed the most important part of a power purchase agreement, price. And then Eurus requested HECO to consider the project for a power purchase agreement. And then in the following four months, negotiations between Hawaiian Electric and Eurus happened. These were final negotiations. There was a formal manifestation of intent to begin negotiations for this. The expression of interest was a formal approval process of that. And so no later than January 31st was this project shortlisted. And that is what the extrinsic evidence here that the district court did not consider establishes. In California, there's a liberal parole evidence rule. And so even if the terms of a contract are facially unambiguous, if extrinsic evidence creates the possibility of an ambiguity, the district court may not rely on the text alone. But that is what the district court did here. And so the extrinsic evidence was that in the 30B6 deposition testimony of Hawaiian Electric, Mr. Rodney Chong testified that this project had been essentially shortlisted. Essentially. That's the problem. Essentially shortlisted and shortlisted are two different things. So he's equating what happened with being shortlisted, but he's not saying that the company was actually shortlisted. He said essentially shortlisted. And that's not the same. Your Honor, I would respectfully disagree. It is our position that to be essentially shortlisted is to be shortlisted. But if you look at his whole statement, he says, if not for the way we typically formally use the term, then, yes, it was essentially shortlisted. So, I mean, it seems that even he himself is saying this is not shortlisting. He would simply just be agreeing that the narrow definition of this, the technical definition of shortlist was not being applied. Juris had every opportunity to apply the technical, the formal definition to this. It did not. When they entered into this consultant services agreement in June 2012, it was the mutual intent of the parties for this termination provision to provide protection against. If a term is defined in the industry and that term is used, how is that ambiguous? Because still the technical terms are not, technical meanings are not used unless it's specifically defined in the contract. What case says that, that technical terms cannot be used unless they're. I believe that's the California Civil Code, Your Honor. So, in this case, the ordinary meaning should be applied first over the formal meaning. And that is what Mr. Rodney Chong was saying when he said that. The ordinary meaning, the district court said that the ordinary meaning of shortlist includes a list. Yes. And he limited that to a tangible list. And we disagree and request the court to reverse that. And I'd like to reserve my time for. All right. Thank you. Good morning, Your Honors. Jennifer Meeker on behalf of Apelli, Uris Energy America Corporation. I want to thank you for your time today and for your careful consideration of this matter. I think your questions are showing that you have studied the briefs and studied the record quite well. And I don't want to, you know, belabor any certain points. I think our briefs lay things out quite well. Let me get to what I consider a major issue for me. Why should Uris get to decide who the abogor is on the royalty agreement? There is a written contract. Why shouldn't Sun Farms have the benefit of what's explicitly provided for in the contract? And that's a good question, Your Honor. And thank you. I think a couple of things are important that are borne out by the record here. And it has to do with the negotiations about the royalty agreement. But the negotiations, we all agree, don't we, the negotiations did not result in an agreement. So you can't pick and choose and say, well, we like this part of the negotiation, but we didn't like that part of the negotiation, so we're going to implement what we like and we're going to disregard what we don't like. You can't do that. I absolutely understand, Your Honor. In this case, I think what ended up happening was Uris was kind of caught between a rock and a hard place, so to speak. And part of that had to do with the fact that during the negotiations, the counsel for appellant had requested that Uris be added to the royalty agreement. And I think that, you know, notwithstanding the fact that they didn't say, hey, substitute Uris instead of the project agreement. We want both of them instead. But ultimately what I think Uris was coming to the conclusion on was this wasn't going to lead to an agreement. They needed to have a definitive agreement so that they could substantially comply with their requirements for a royalty agreement under the CSA. And ultimately, you know, given discussions between counsel, it seemed that there was a desire that it would be advantageous to appellant to have Uris as the obligor rather than the one asset entity of the project company. But that was never agreed to. That's correct. It was never. We will admit it's a technical violation of the agreement. Well, what's a technical violation still is a violation. That's correct. And under California law, to have a compensable breach of contract, a cause of action for a breach of contract, and to prove that cause of action, you need to have not only a breach, but you also have an independent showing of damages. Well, let me ask you this. This is kind of what bothered me. What happens if a year from now Uris decides to sell the asset? Who becomes the obligor of the – because you're supposed to pay the royalties out of what's the term, free cash or distributable cash. So what if there's no distributable cash? You've sold it. So under these circumstances and based on the testimony that came out during discovery, Nick Henrickson, who's the person most knowledgeable and the corporate representative of Uris, testified that even in the indication where the YNI project is sold, that Uris is still obligated to pay these royalty payments. And that's undisputed. But what if Uris doesn't have the distributable cash to pay them, pay the royalties at that point? Yeah. And, you know, Your Honor, I think ultimately that if there was – and this wasn't in the record at all and under any circumstance. It wasn't part of discovery. And so I might be speculating a little bit here, and I apologize for that. But I think that if in the unlikely event that Uris decides to sell its interest in the project company or the project itself, which there's no indication that that's going to happen, but if that happens, there's going to have to be a structuring where these royalty payments are still going to be made by Uris. Well, how can that be if Uris isn't even – I mean, there's no agreement actually between Uris and Sun Farms. So how can that be? How can you structure a payment arrangement between parties who don't even have an agreement? Well, we disagree that there's no agreement here. You think there's an agreement between Uris and Sun Farms? Absolutely. The royalty agreement that Uris executed and sent to Sun Farms and has been acting in accordance with ever since, it's our position that that is a binding agreement. And the evidence in the case and the uncontroverted testimony in the case from Uris is that that is a binding obligation, contractual obligation on Uris. But the negotiations for that agreement were not successful. Some of the terms that Uris wanted, Sun Farms would not agree to. So how can that be a binding agreement if there were still terms that were not agreed upon? We don't believe that there weren't terms that weren't agreed upon. What we believe is that the consulting services agreement had a requirement of – sorry, I just checked the time. It had a requirement for the specific terms that would be required in an ultimate royalty agreement. And those have – there's five very specific terms, and this is set forth in Section 2 of the consulting agreement. And that includes 75% gross revenue of the project company from power sales, that it's paid annually in arrears with 30 days after the end of each calendar year. It's from distributable casts. And that there's a term which is a maximum of a ceiling of $2,070,000 or the 20th anniversary or, in another circumstance, the 25th anniversary of the COD date. And so our position is that the consulting agreement actually laid out the required terms for the royalty agreement. And the royalty agreement that was executed by Uris and sent to Sun Farms and that has been performed ever since contains verbatim those. Sun Farms never signed it. They never signed it, but they certainly have accepted it by taking five, six payments. Sun Farms said they didn't accept it because Uris wanted them to waive certain rights that they had, and they weren't willing to waive those rights. And I absolutely understand that allegation. And in the beginning of the negotiations, Uris did ask for Sun Farms to waive a concept of fiduciary duty or implied covenant in the royalty agreement, which that term during negotiations was later withdrawn and was never part of the ultimate agreement. And that has been also completely misconstrued. The reason that that was included was that Uris was concerned that you didn't maximize power sales, you didn't do more to sell more, and so therefore you breached the agreement. And so they were trying to protect themselves from having to operate Wai'anae for the benefit of the Kauai community really instead for the benefit of appellants. But ultimately that term was in fact removed from the agreement and was never part of the final royalty agreement that was sent by Uris and has been performed ever since. I'm going back to the royalty agreement. First of all, it's distributable cash. So if you sell it, you won't have distributable cash. And secondly, it's based upon gross revenue of the company. And if you sell the company, how will you even know what the gross revenue is? So how will you compute the royalty if you don't own the company? I understand that question. And again, that wasn't a part of the district court proceedings. So all you're saying is there's got to be a new agreement negotiated, and what happens if they don't agree to it? I don't think that it needs to be a new agreement. I think what ends up happening is between the buyer and the seller, the seller being Uris, if there was in the hypothetical speculative situation where this entity is sold or the project is sold, I think what would end up happening is that Uris, having this binding royalty agreement where they owe Sun Farms, and they don't contest that they owe Sun Farms these royalties from distributable cash paid in arrears on a yearly basis, that there is going to have to be some kind of either carve-out or reporting between the buyer and Uris so that the amount of that distributable cash is still going to then be reported to Uris such that they can make these royalty payments. But there is no indication anywhere in the record that Uris is going to be one day unwilling, unable to make these payments. And frankly, Your Honor, with the well-settled rules of waiver in the Ninth Circuit, this shouldn't be at issue in this case because this wasn't raised in the district court case, which causes a lot of problems. And the district court, Judge Lorenz, at the end of his order, pointed out that this has been a moving target with new theories and new facts and new everything from day one. And at some point, Judge Lorenz wasn't going to allow it to continue on. And the evidence and the case law in front of Judge Lorenz indicated that summary judgment was in favor of Uris was appropriate because there are no facts. And under California law, the fact of damage needs to be certain to a degree. It can't be speculative. And there are no evidence in this case that would indicate that Uris is someday going to either sell this property, is going to somehow structure things away, is going to somehow do anything that would cause them to not pay these royalties. How do you respond to Sunfarm's argument that there is a market now for this royalty agreement, but only if the agreement is with the project company and not with Uris and that that's like an existing damage? There's no evidence of that whatsoever, Your Honor. The mention of a sale of this royalty agreement was not mentioned at all during discovery or during summary judgment briefing in this case. This is a new argument that was invented on appeal. So, counsel, if the unthinkable happens and Uris does sell the asset, then would Sunfarms have a new cause of action against Uris? I think that if they didn't pay, if something caused it where they didn't make their royalty payment, which is due at the end of January, then, as Judge Lorenz said, they have a cause of action for breach of the royalty agreement against Uris. There is a remedy there if that happens. Well, Uris could actually say there is no agreement because it hasn't been signed by Sunfarms. I think that would be hard in light of the arguments, the briefing, the public record, the penalty under perjury, statements that says that Uris is bound. I think that would be a very, I mean... Stranger things have happened. I understand, Your Honor. I understand. I see that my time is out. I didn't reach the Palihua argument. I don't know if you guys have questions. Otherwise, I am going to respect the time limit. Thank you. Thank you, counsel. Thank you. Good morning, Your Honors. Michael Sims for Apelli Toyota Susho America. I only have three minutes, so we'll get right to it. In short, my client should have never been sued, should not have been in this case. Judge Lorenz disposed of the claims against my client in a single footnote. As succinct as it was, it was also indisputably correct. There was not a single piece of evidence in the case that showed my client controlled Uris or had any involvement in the contract at issue here. And as Judge Lorenz pointed out, control is required under any theory of derivative liability that plaintiffs assert here, whether that's alter ego, agency principles, or even the new unpled theory of this joint enterprise theory that we address in our brief. So this is a rare case where there really is just not a single fact. We move to summary judgment. We pointed out that TAI has different offices, directors, employees, bank accounts than Uris. So there's undisputed evidence that TAI did not control Uris. And conversely, but equally important, no evidence offered by plaintiffs that my client controlled Uris so as to be liable on any basis of derivative liability. There was just one point that I wanted to address in plaintiff's reply brief where they attach a screenshot, which was to horse the record. This is new. They took a screenshot from the Internet and claimed that TAI and Uris share offices based on the screenshot. If you actually go on the Internet, it shows two dots. One dot says Toyota Susho location. The other dot says affiliate location. That is Uris. There's no secret that the companies are affiliates. And if you simply Google the two companies, their San Diego addresses, a simple Google search reveals that they have different addresses in San Diego. So it's remarkable that, frankly, they would make such an assertion. But that's been par for the course here. We addressed some of the other mischaracterizations and distortions of the record in our brief. So with that, if the panel has any question or doubt whatsoever that Judge Lorenz's decision with respect to TAI was correct, I can address those now, of course. Thank you, counsel. It appears not. Thank you. Rebuttal. Counsel, could you briefly address the derivative liability issue? Yes. And we say that there is sufficient evidence to survive some re-judgment. The burden has shifted to us, and we have provided sufficient evidence for both enterprise liability, agency liability, and partnership liability. I mean, you can look on Toyota's website today, and it still says partnership with Uris. I mean, it advertised itself as a partner with Uris, and we believe that there were sufficient allegations for joint enterprise. And the issue of – But allegations aren't enough. There has to be, for summary judgment, there has to be some evidence. Sorry. Yes, Your Honor. There were the declarations, and so there were directions from Toyota to Sun Farms in order to arrange these high-level meetings to pursue the development of these two projects. And so we believe there is sufficient evidence to establish control. And then just quickly, Your Honor, we would like to say just, you know, the district court's ruling, if not – this is page 40 of our brief. The district court's ruling, if not reversed, would force a non-breaching party to acquiesce to a new agreement and to continue business relationship with an unscrupulous corporation for an additional 20 years. That is what we're asking for. We're asking for simply nothing more than what the contract promised us. We do not want a contract with Uris. We do not want a 20-year relationship continued with Uris here. We would request the court to reverse the district court's order denying Sun Farms summary judgment and then reverse the district court's order granting Uris and Toyota summary judgment. Thank you, counsel. Thank you. Thank you to both counsel for your helpful arguments in this challenging case. The case, as argued, is submitted for decision by the court.
judges: RAWLINSON, Melloy, THOMAS